Tilghman C. J.
The insurance in this case, was on, goods, shipped on board the schooner Antoinette, from St. *59 Thomas, to Laguira, “ warranted by the assured, free from anv charge, damage or loss, which may arise, in consequence of the seizure or detention of the property, for, or on account of any illicit or prohibited trade.” The schooner was captured by a Spanish privateer, on the 18th June, 1807, within little more than a league from Laguira. The captors carried her to Porto Cabello. There proceedings were instituted in the court of admiralty, against vessel and cargo, in consequence of which the plaintiffs lost their property.. The nature of these proceedings I shall mention more particularly hereafter. Suffice it to say, at present, that the. reason assigned by the court, in justification of the capture, was, that the goods were of British manufacture. The king of Spain, had, by a royal decree, of the 19th February, 1807, at Aranjuez, adopted the decree of Berlin, made by the emperor of France, on the 21st November, 1806. Whether there was not also, another royal order of the king of Spain, or an order of his Captain General, and Intendant of the province in which Laguira was situated, prohibiting the importation of goods of British manufacture, is matter of doubt, and to afford an opportunity for ascertaining it, a second trial was granted in this cause. The doubt has not been removed by this trial, in which very little new evidence was produced. But, as the jury have again found for the plaintiff, which they ought not to have done, had there been any prohibitory decree or order, except that of Aranjuez,.via must now take for granted, that there was no other. The question then will be, whether the defendants’ warranty extends to the capture in this case; in other words, whether this was a seizure for illicit or prohibited trade, within the meaning of the warranty. That it is within the words of the warranty, is certain, for the decree of Berlin prohibits, in express terms, all trade in British manufactures. By the 5th article of that decree, “ the trade in English merchandise is forbidden. All merchandise, belonging to England, or coming from its manufactories and colonies, is declared good and lawful prize.” But it is not contended, that unlawful prohibitions are within the meaning of this warranty. Neither is it contended, that the decree of Aranjuez was lawful, with regard to neutral nations, as to vessels not bound to Spain or her colonies. No belligerent has a right to say, that neutral nations shall not trade in the manufactures, of his ene *60 my. If such right existed, the commerce of all Europe and America would have been suspended. For there was a time when France prohibited all trade with England or her colonjeg^ an¿ England prohibited all trade with France or her allies or any of their colonies. But the United States never acknowledged the legality of such prohibitions, neither did the underwriters ever assert, that they were protected by the warranty of the assured, against captures made in pursuance of orders which violated the law of nations. In Kohne v. The Insurance Company of North America, a case much contested, property belonging to a citizen of the United States, was captured under the British orders in council, because the voyage was from one of the Spanish colonies in America to old Spain. It was not pretended, that the case fell within the warranty, although the trade was prohibited by England. This warranty was introduced into our policies of insurance, a little before the French revolution, and was no doubt intended, to protect the insurers from loss, in consequence of an attempt to violate the commercial regulations of the country to which the vessel was bound. The decree of Berlin is no commercial regulation, but an extreme belligerent measure, intended to ruin England, by destroying her commerce and manufactures at the expense of the neutral nations. So far as it operated on the ocean, at, a distance from the Spanish coast, the defendant’s counsel give it up. But they say, that Spain had a right to confiscate all British manufactures found within her own territory. That she had a right to prohibit the importation of British manufactures, does not admit of a doubt. But the decree of Berlin, which she adopted, does not prohibit importation, but makes the goods lawful prize, wherever found. The capture, in the present case, was made, not merely because the goods were intended to be brought into the Spanish dominions, but because they were manufactured in England. They happened to be taken Within less than a league of the Spanish coast j but it would have been the same thing, had they been taken in mid-ocean. The decree under which they were taken, made no difference ; they were equally good prize in one place and the other. The case is not so strong, as if the goods had been seized in port. For, even if Spain had a right to confiscate them, when actually within her territory, it does not follow, .that her cruisers had a right to seize them at sea, though *61 near the coast, under a decree which contained no particular prohibition of importation, no regulation concerning the Spanish commerce, but a general declaration, that such goods, wherever found, were lawful prize. The proceedings in the Spanish court of admiralty are of a singular nature. The sentence of the 24th June, 1807, purports to be a decree of condemnation. Yet in the subsequent proceedings, of the 14th July, 1807, it is determined, that the record shall be sent to the supreme tribunal of prizes of the admiralty, by tv ay of consultation, that it may be pleased to decide according to the royal will. So that considering the whole proceedings, the sentence of the 24th June, seems to be of the nature of an interlocutory order, and we have no evidence what the final decree was, or whether there ever was a final decree. But it appears plainly enough, from the report of the auditor, which was adopted by the Court on the 14th July, that there was very great dissatisfaction in the province, at the capture of neutral vessels under the decree of Aranjuez ; and it also appears by the evidence, that in many instances goods of British manufacture had been permitted to be imported, that decree notwithstanding. Considering then, the hostile nature of the Aranjuez decree, in its general character; considering the nature of the warranty in this policy, which was intended to protect the insurers against seizure for breach of the laws of trade ; and considering that these goods were seized at sea, and that they were subject to condemnation, not because they were about to be imported into the Spanish dominion, but because they were of British manufacture, I am of opinion, that the case is not within the warranty.
Another ground for a new trial, was taken by one of the defendant’s counsel; that is to say, that the circumstances of the goods being of British manufacture, ought to have been disclosed to the insurers, because the risk wqs increased by it. That objection comes too late. The cause has been twice tried, without its ever being suggested, that the assured were guilty ®f an improper concealment. This affords a violent presumption, that in the opinion of the insurers, there was nothing to complain of. For aught we know, the information may have been given, and no evidence may have been offered at the trial, because neither party thought it necessary to say any thing on the subject. There would be no end *62 to new trials, if they were granted for defect in matters of fact, not thought material at the time of trial, and which, had they been mentioned, might have been proved. The Court 0Ug}lt now t0 presume, that the defendants have no cause for complaint, in point of concealment. Upon the whole, I am .. .. , , ... . or opinion, that there should not be a new trial.